CR-15-00924-PHX-GMS(DKD), July 30, 2015

1               **UNITED STATES DISTRICT COURT**

2               **FOR THE DISTRICT OF ARIZONA**

3

```
    United States of America,           )
4                                       )
                    Plaintiff,          )   CR-15-00924-PHX-GMS(DKD)
5                                       )
              vs.                       )   Phoenix, Arizona
6                                       )   July 30, 2015
    Robert Kenneth Deatherage and Erik  )   1:37 p.m.
7   Stephen Foster,                     )
                                        )
8                   Defendants.         )
    _____)
9
```

10   **BEFORE:**   **THE HONORABLE EILEEN S. WILLETT, MAGISTRATE JUDGE**

11                  **TRANSCRIPT OF PROCEEDINGS**

12              **ARRAIGNMENT/DETENTION HEARING**

13

14

15

16

17

18

19

20

21   Transcriptionist:
     **Elaine Cropper**
22   Sandra Day O'Connor U.S. Courthouse
     401 West Washington Street, SPC 35
23   Phoenix, Arizona  85003-2150
     602.322.7245/(fax) 602.322.7253
24

     Proceedings Recorded by Electronic Sound Recording
25   Transcript Produced by Transcriptionist

A P P E A R A N C E S

For the Government:
    **LISA JENNIS , ESQ.**
    U.S. Attorney's Office (Phoenix)
    40 N. Central, Suite 1200
    Phoenix, AZ 85004-4408
    602.514.7500/(fax) 602.514.7650

For the Defendant Erik Stephen Foster:
    **LOYD C. TATE, ESQ.**
    Law Office of Loyd C. Tate
    1921 S. Alma School Road, Suite 303
    Mesa, AZ  85210
    480.345.1400/(fax)480.345.1531

For the Defendant Robert Kenneth Deatherage:
    **JOHN CONROY ROCK, ESQ.**
    Law Offices of John Rock, P.C.
    10645 N. Tatum Blvd., Ste. 200-646
    Phoenix, AZ  85028
    602.694.5070/(fax) 602.443.2221

**P R O C E E D I N G S**

1
2      (Court was called to order by the courtroom deputy.)
3      (Proceedings begin at 1:37.)
4          COURTROOM DEPUTY: Criminal docket 15-924, *United
5  States of America v. Robert Deatherage and Erik Foster*, on for
6  arraignment and a detention hearing.
7          MS. JENNIS: Good afternoon, Your Honor. Lisa Jennis
8  on behalf of the United States.
9          THE COURT: Good afternoon.
10         MR. ROCK: Good afternoon, Your Honor. John Rock on
11 behalf of Mr. Deatherage who is present and in custody.
12         THE COURT: Good afternoon.
13         MR. TATE: Good afternoon, Your Honor. William Tate
14 on behalf of Mr. Erik Foster who is immediately to my left.
15         THE COURT: Good afternoon.
16         Gentlemen, you are here for an arraignment. Let's
17 handle that first.
18         Counsel, have you reviewed the indictment with your
19 clients and that indictment was filed on July 28, 2015?
20         MR. ROCK: As to Mr. Deatherage, Your Honor, I have
21 and I provided him a copy.
22         THE COURT: Is his name correct on it?
23         MR. ROCK: It is and we would ask to waive the formal
24 reading and enter a plea of not guilty and a denial of the
25 forfeiture allegations.

1        MR. TATE:  Judge, as to Mr. Foster, I reviewed the
2   indictment with him.  His name is spelled correctly.  We waive
3   a reading of the indictment, ask the Court to enter not guilty
4   pleas on his behalf and the denial to the forfeiture
5   allegations.
6        THE COURT:  Your not guilty pleas are entered as part
7   of the record, gentlemen.  In addition, it's ordered setting
8   firm trial date as to both of you on September 1, 2015, at 9
9   a.m.  You'll be before Judge Snow in courtroom 602 and there is
10  a 21-day deadline on pretrial -- actually, I have a pretrial
11  motion deadline currently set.  The judge has set your pretrial
12  motion deadline for 8-19-15.
13       All right.  And then it is my understanding that
14  we're going to go ahead and have a detention hearing today.  I
15  am ready.
16       MR. TATE:  Judge -- I'm sorry.  Please.
17       MS. JENNIS:  You can go first.  It's fine.
18       MR. TATE:  Judge, I am asking, if it please the Court
19  and it is convenient for the Court, I had a chance to talk with
20  the Government and the Government is willing to allow
21  Mr. Foster's release, of course with certain conditions, so I
22  am asking if it is convenient for the Court, if we could go on
23  and review the conditions with Mr. Foster of his release
24  conditions that he may not, and I may not, have to stay for a
25  detention hearing for Mr. Deatherage.

1          THE COURT:  The Government is not seeking detention
2   with regard to Mr. Foster?
3          MS. JENNIS:  So, Your Honor, between the first
4   hearing and now, I did speak with Pretrial and I requested that
5   they find a suitable third-party custodian for Mr. Foster which
6   they did, his mom who is here today.  And they added additional
7   conditions.  We also discussed some post-traumatic stress
8   disorder that Mr. Foster has and whether he could seek
9   treatment and what that treatment would be.  And speaking to
10  Cici Foster, the Pretrial Services officer, who is not here
11  today but who wrote the report, she did say that she has seen
12  some success with such treatment in other defendants.
13         Also, Your Honor, I need to correct the record for
14  the complaint.  At the time the complaint was written, we had
15  not been able to review the surveillance footage in this matter
16  so I know Your Honor was given the complaint yesterday for
17  Mr. Frazier's detention hearing.  In paragraph 20 of the
18  complaint, they talk about Mr. Frazier and Mr. Foster exiting
19  the Camry and going to get the narcotics and Mr. Foster doing
20  security.
21         It appears from -- very obviously from reviewing the
22  footage, that it is not Mr. Foster.  Rather, it is
23  Mr. Deatherage who exits the Camry and does security while
24  Mr. Frazier gets the narcotics.  Mr. Foster was then -- was
25  always the driver of the Camry which actually does belong to

1  him.

2              And, Your Honor, while --

3              THE COURT:  This is the vehicle that was going in the
4  wrong direction on Grand Avenue?

5              MS. JENNIS:  It was for a short period of time, Your
6  Honor.  I did review the footage and I have the agent here.
7  There was a short period of time where it did go the wrong
8  direction and then it wasn't being followed -- it appears not
9  to have been being pursued by the police at that time and it
10 pulls into an abandoned parking lot, but there's aerial footage
11 the entire time.

12             So they do -- he does -- high-speed chase, he is
13 going at a high speed for a short amount of time.  When the
14 police stopped pursuing him, he does then go with the regular
15 speed of traffic and takes off to Mr. Frazier's girlfriend's
16 house where they were later arrested.

17             The difference between Mr. Foster and Mr. Deatherage
18 and Mr. Frazier to the United States is this has been an
19 ongoing investigation for a while into their militia group,
20 Arizona Special Operations Group, which I discussed briefly
21 yesterday and which you'll have some exhibits of their Facebook
22 when we get to Mr. Deatherage's hearing and the violence
23 expressed by Mr. Deatherage.  And Mr. Frazier is not something
24 we know about in connection to Mr. Foster.  We don't really
25 know much about him other than he showed up at this last -- you

1   know, showed up to steal the cocaine from the back of the car
2   and was driving the vehicle.  However, he did have, just so you
3   know everything, he did have two firearms that were located in
4   the house that belonged to him.  And according to Mr. Frazier,
5   he brought both a rifle and a pistol.  They were in the car
6   when he did steal the cocaine, when he was driving the car.
7              So each of the three defendants had a pistol and a
8   rifle in the Camry when they went to steal the narcotics.
9              THE COURT:  And I realize I have not heard from all
10  of you with regard to these allegations.  Would it be possible
11  to have monitoring?
12             PRETRIAL OFFICER:  Your Honor, that is definitely a
13  possibility.  What we would request is if the Court is looking
14  to possibly release the defendant on location monitoring that
15  Pretrial Services have the opportunity to go to the proposed
16  residence, view that residence, make sure that is an acceptable
17  residence and then submit that information to the Court for --
18  prior to his release.
19             THE COURT:  And, Ms. Foster, you have already
20  reviewed as an acceptable third-party custodian.  Have you seen
21  where she is?  I know she's in the courtroom.  I know
22  Ms. Foster is in the courtroom but have you looked at her
23  residence?
24             PRETRIAL OFFICER:  Your Honor, we have not been out
25  to her residence yet as far as if he were released to that

1  residence.

2  THE COURT:  Then what have you done to determine that
3  she's an appropriate third-party custodian?  Just an NCIC?

4  PRETRIAL OFFICER:  We do the NCIC.  We also discuss
5  the requirements and the expectations of a -- of her being a
6  third party which she has agreed to.

7  If he were to be released there, to that specific
8  residence with the electronic monitoring, we would definitely
9  want to go out and see if that was an appropriate residence in
10 that regard.

11 THE COURT:  You were not anticipating that he would
12 be released to her residence?  You were simply anticipating
13 that she would be a third-party custodian?

14 PRETRIAL OFFICER:  I am not aware of what the address
15 is of her residence.  If it is the 334 South 227th Court, if it
16 is that residence, that he is listed -- that is listed in the
17 original bail report, we have not been out to that specific
18 residence.

19 THE COURT:  Obviously the Court has concerns which is
20 why the Court is asking questions.

21 Counsel, go ahead.

22 MR. TATE:  Thank you, Judge.  You can see my
23 bursting.

24 THE COURT:  I saw you in my peripheral.  I was going
25 to give you the opportunity to be heard.  Go ahead.

1     MR. TATE:  Thank you, Judge.

2     Judge, I think one -- and, again, I don't fault the
3 Government.  I understand that the Government gets the
4 information that is provided them from the particular officers
5 but from the outset and from experience, what we have found is
6 that affidavits are written as if they are seamless, as if the
7 person that writes the affidavit -- and, again, I am not
8 questioning the probable cause and that has been determined by
9 the indictment.  But an affidavit is written for a complaint
10 and it is written seamlessly, as if the person is observing it
11 and all of that.

12     And then we find out time and time again it is not.
13 It is something that is culled from what somebody else says,
14 another officer's report, and so some of the accuracy of it is
15 not -- it is not accurate.

16     Judge, there is nothing here that shows that
17 Mr. Foster, with all of the preparation, and I am anticipating
18 getting 35, 36 discs from the Government printed out over 100
19 some pages and there is nothing that shows that Mr. Foster was
20 a part of the preplanning or preparation or any of this other
21 than being there on the scene.

22     So to allay some of the Court's fear, I understand --
23 and Mr. Foster will submit to any electronic monitoring or any
24 monitoring that the Court sees fit for treatment that the Court
25 sees fit.  But I do, knowing that the Court has had a hearing

1  before now and had some precursor on to some facts, I just want
2  to underline a little bit that now we find out that those facts
3  might not be the same or completely accurate, particular to
4  Mr. Foster.  He is willing to submit to any conditions that the
5  Court would deem necessary for him to be on release.
6              THE COURT:  Thank you, counsel.
7              And Mrs. Foster is here.  Ms. Foster if you would
8  stand up.  Would you come on forward?
9              Yes, ma'am.  Would you mind raising your right hand?
10 I'm going to swear you in.
11             MS. FOSTER:  Okay.
12             (Mrs. Foster was sworn.)
13             THE COURT:  Ms. Foster, you've now been sworn.  You
14 have to tell the truth when you're under oath.  You can be
15 convicted of perjury if you lie.  The Government has right in a
16 prosecution for perjury or false statement to use against you
17 any of the statements that you make when you're under oath.
18             MS. FOSTER:  Okay.
19             THE COURT:  The reason that I asked you to talk to me
20 is you because they have identified you -- "they" being trial
21 Pretrial Services has identified you -- as a third-party
22 custodian so please tell me your full name for the record.
23             MS. FOSTER:  Sinnika Ann Makkla Foster.
24             THE COURT:  And are you the mother of Mr. Foster who
25 is here as a defendant in this case?

1        MS. FOSTER:  Yes, ma'am.
2        THE COURT:  And you reside at -- I was watching up in
3   the courtroom and I know counsel probably weren't able to see
4   you but you were nodding your head.  Do you reside at 334 South
5   227th Court in Buckeye, Arizona, 85326?
6        MS. FOSTER:  Yes, ma'am.
7        THE COURT:  That's your residence?
8        MS. FOSTER:  Yes, it is.
9        THE COURT:  And are you willing to have your son live
10  with you, ma'am?
11       MS. FOSTER:  Yes.
12       THE COURT:  Now, a third-party custodian, it's a very
13  important role and it's a very difficult role actually.  You
14  have to become familiar with all of the conditions of release
15  were I to release your son.
16       You would have to become familiar with all of those
17  conditions of release and then you would have to be able to
18  tell me under oath that you would be willing to make sure that
19  he abides by those conditions to the best of your ability.  And
20  most importantly, if he does not, you would have to tell
21  Pretrial Services and that is difficult because he's your son.
22       Would you be willing and able to do that?
23       MS. FOSTER:  Yes, ma'am, I would.
24       THE COURT:  All right.  Okay.  Thank you very much.
25  You may be seated.

United States District Court

1    MS. FOSTER:  Thank you.

2    THE COURT:  I should also -- wait a minute.  I should
3 also tell you, ma'am, if you don't, then I can find you in
4 contempt.

5    MS. FOSTER:  I understand.

6    THE COURT:  All right.  Thank you.

7    I am not comfortable in releasing Mr. Foster without
8 having an ability to monitor him.  So what I'm going to do,
9 counsel, is I am fine with the rest of the conditions that have
10 been stated in the addendum report and I will identify that for
11 the record as the report of 7-29-15 that was released at 11:50
12 a.m.  The rest of those conditions appear to me to be
13 completely appropriate.

14    However, I am not comfortable releasing him without
15 having location monitoring in place.

16    So what that is going to do is it's going to require
17 an analysis of the home so I am not going to be able to do
18 anything at this moment.  That is going to have to happen
19 before I can make that determination.  So I can have you back
20 here tomorrow at 1:30 or at 3:45.

21    Does that work for counsel?

22    MR. TATE:  Judge, I would ask, due to my schedule, if
23 possible, if we could do this at 3:45 and have Mr. Foster
24 brought up bag and baggage.

25    THE COURT:  M'hum.

United States District Court

1           Can you do it by then?
2           MS. JENNIS:  I was just asking Pretrial if they were
3  able to -- the United States will always be available for any
4  hearing at any time.  I was more concerned if Pretrial could
5  actually get out there.
6           THE COURT:  Are you able to do it by then?
7           PRETRIAL OFFICER:  Your Honor, we can make it happen.
8           THE COURT:  All right.  Thank you.  Thank you,
9  Pretrial.  I know you're working hard.
10          All right.  Then I'm going to continue your case,
11 sir, to tomorrow at 3:45 and it is ordered that he be
12 transported bag and baggage in anticipation of having an answer
13 to the Court's question.
14          MR. TATE:  Judge, and a question that Mr. Foster has
15 asked.
16          THE COURT:  Yes, sir.
17          MR. TATE:  And I am -- one of the conditions that
18 Mr. Foster is going to have -- and I guess we can address it --
19 I'm just seeing if there's anything that can be done before
20 tomorrow.  His car, cell phone, driver's license and wallet
21 were taken.  He would definitely need his car and wallet and
22 driver's license in order to seek gainful employment.  And I
23 wanted to see if those items could be returned to him with his
24 release in order to facilitate him seeking employment.
25          THE COURT:  This vehicle was the vehicle that was

1  alleged to have been used in the offense?
2              MR. TATE:  Yes, ma'am.
3              THE COURT:  Okay.  Well, then that is not something I
4  can answer.  That is evidence.
5              MR. TATE:  Yes, ma'am.  If the other -- is the
6  Government seeking --
7              THE COURT:  So I will let you and the Government talk
8  about that --
9              MR. TATE:  Yes, ma'am.
10             THE COURT:  -- at another time.
11             MR. TATE:  Yes, ma'am.
12             THE COURT:  Thank you very much.
13        (Proceedings concluded at 1:54 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

                    United States District Court

C E R T I F I C A T E

     I, ELAINE M. CROPPER, court-approved transcriber, certify that the foregoing is a correct transcript, to the best of my skill and ability, from the official electronic sound recording of the proceedings in the above-entitled matter.

     DATED at Phoenix, Arizona, this 18th day of January, 2017.

s/Elaine M. Cropper

_____

Elaine M. Cropper

United States District Court