CR-15-00924-PHX-GMS(DKD), August 4, 2015

1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3

**United States of America,**          )
4                                       )
                    Plaintiff,          )   CR-15-00924-PHX-GMS(DKD)
5                                       )   August 4, 2015
            vs.                         )   Phoenix, Arizona
6                                       )
**Erik Stephen Foster,**                )   1:34 p.m.
7                                       )
                    Defendant.          )
8   _____)

9
    BEFORE:  THE HONORABLE EILEEN S. WILLETT, MAGISTRATE JUDGE
10
                 **TRANSCRIPT OF PROCEEDINGS**
11
              **DETENTION HEARING (Continued)**
12

13              A P P E A R A N C E S

14  For the Government:
            **LISA JENNIS, ESQ.**
15          U.S. Attorney's Office (Phoenix)
            40 N. Central, Suite 1200
16          Phoenix, AZ 85004-4408
            602.514.7500/(fax) 602.514.7650
17
    For the Defendant:
18          **LOYD C. TATE, ESQ.**
            Law Office of Loyd C. Tate
19          1921 S. Alma School Road, Suite 303
            Mesa, AZ  85210
20          480.345.1400/(fax)480.345.1531

21  Transcriptionist:
    **Elaine Cropper**
22  Sandra Day O'Connor U.S. Courthouse
    401 West Washington Street, SPC 35
23  Phoenix, Arizona  85003-2150
    602.322.7245/(fax) 602.322.7253
24
    Proceedings Recorded by Electronic Sound Recording
25  Transcript Produced by Transcriptionist

              United States District Court

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1                    **P R O C E E D I N G S**

2        (Court was called to order by the courtroom deputy.)

3        (Proceedings begin at 1:34.)

4            COURTROOM DEPUTY:  Criminal docket 15-924, *United*

5   *States of America v. Erik Foster,* on for a continued detention

6   hearing.

7            MS. JENNIS:  Good afternoon, Your Honor.  Lisa Jennis

8   for the United States.

9            THE COURT:  Good afternoon.

10           MR. TATE:  Good afternoon, Your Honor.  Loyd Tate on

11  behalf of Mr. Erik Foster who is in custody, seated to my

12  right.

13           THE COURT:  Good afternoon.

14           This matter was continued from Friday I believe.  The

15  Court had some questions of counsel and counsel did need the

16  opportunity to review some documentation that was provided.

17           So, therefore, the Court begins with its questions

18  that it had on Friday and then you can both present what you

19  would like to present today with regard to what you've since

20  seen.

21           But my first question was, is this a presumption case

22  and what is the minimum mandatory sentence on Count 1 and any

23  maximum sentence?

24           MS. JENNIS:  So the minimum mandatory would be ten

25  years, Your Honor, because it's five kilos or more of cocaine.

United States District Court

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1          THE COURT:  And is there a maximum?

2          MS. JENNIS:  Life, Your Honor.

3          THE COURT:  Therefore, this is a presumption case?

4          MS. JENNIS:  Yes, it is.

5          THE COURT:  All right.  The next question the Court

6     had was, I needed more specifics with regard to the alleged

7     role of this individual and what was actually observed by law

8     enforcement with regard to that exact role as alleged in the

9     indictment.

10          MS. JENNIS:  Yes, Your Honor.  And I think we had

11    discussed that the complaint is accurate up to the end of the

12    complaint.  So what was observed is all the communication with

13    the undercover agent was between co-defendant Paris Frazier and

14    the undercover.  It was not -- did not involve Mr. Foster.

15          On the date of this case, I think it was on July 22,

16    law enforcement did observe the defendant and his two

17    co-defendants driving in the defendant's car so I'll just refer

18    to the defendant would be Mr. Foster if that's okay?

19          So they were in Mr. Foster's Camry, the three of

20    them, and they met in the undercover parking lot.  Only

21    Mr. Frazier exited the car to meet the undercover agent.

22          THE COURT:  Who was the driver?

23          MS. JENNIS:  The driver at the time was Mr.

24          And after that meeting, Mr. Foster -- and, again, the

25    co-defendants, again, Mr. Foster is driving, proceed eventually

United States District Court

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1    to the warehouse where the car that contains the cocaine is

2    parked.  They do some countersurveillance.  Again, Mr. Foster

3    is driving so they kind of drive around the location for about

4    15 minutes.

5           Then they get to the warehouse which is surrounded by

6    a gate, a fence, and a locked gate.  Mr. Frazier gets out of

7    the front seat -- front passenger side of the car and he cuts

8    the lock.  Then as he returns to the car, Mr. Deatherage gets

9    out of the back seat of the car and Mr. Deatherage goes through

10   the gate.  Mr. Frazier is behind him.  Mr. Foster remains in

11   the car.

12          It's a little bit of a walk, you know, to get to the

13   car that contains the narcotics.  When they get close to the

14   car, Mr. Deatherage stops and appears to conduct some sort of

15   security.  We cannot see any firearms.  They are never observed

16   on the video.  There's no firearms observed because -- there is

17   air surveillance going on at this time.

18          When Mr. Frazier gets to the car, he opens the trunk

19   and then he opens the rear back seat, back door of -- it's a

20   four-door car and closes the door.  Then he goes back to the

21   trunk and he takes out six kilos of cocaine.  Him and

22   Mr. Deatherage then return to the car.  As they are returning,

23   you do see -- I can't see inside the car but I know that --

24          THE COURT:  Which car?  You've got two cars.

25          MS. JENNIS:  I'm sorry.  I can't see inside the

United States District Court

1    Camry, which is owned by Mr. Foster.  You can't see inside of

2    it but you can see the car door's open on the passenger side,

3    both the front and the back.  And Mr. Deatherage and

4    Mr. Frazier then get into the Camry which is still driven by

5    Mr. Foster.

6            And just in case Your Honor is reading -- I'm sure

7    you've read the complaint.  That is where the mistake was.  We

8    originally thought it was Mr. Foster who got out of the car

9    with Mr. Frazier and Mr. Deatherage was driving.  Upon review

10   of the surveillance tapes, that is clear that that is not what

11   happened.  What happened is what I told you and that Mr. Foster

12   remains in the car at all times and is the driver of the Camry.

13           THE COURT:  Okay.

14           MS. JENNIS:  So the two of them, Mr. Frazier and

15   Mr. Deatherage, get in the car.  The car kind of takes off and

16   within seconds, is lit up by law enforcement trying to get them

17   to stop.  It doesn't stop.  It continues to go at a high rate

18   of speed through traffic.  It's approximately 7 o'clock.  It's

19   between 6:30 and seven.  I'm sorry, Your Honor, I do the

20   agents.

21           THE COURT:   a.m. or p.m.?

22           MS. JENNIS:   p.m. on a Wednesday and he --

23           THE COURT:  Where?

24           MS. JENNIS:  In Phoenix approximately --

25           Excuse me one second.

United States District Court

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1              (Ms. Jennis confers with the case agent.)

2              MS. JENNIS:  Indian School and 43rd Avenue, Your

3    Honor.  I did watch the video.  I watched the surveillance tape

4    but I can't tell exactly what the streets are.

5              THE COURT:  Between six and 7 p.m. at night?

6              MS. JENNIS:  Yes.

7              THE COURT:  In traffic?

8              MS. JENNIS:  Yes, there's traffic.

9              THE COURT:  All right.

10             MS. JENNIS:  There's traffic but it wasn't stopped

11   traffic.  It was just normal traffic for that time.

12             THE COURT:  And the speed of the car?

13             MS. JENNIS:  I cannot tell but I can tell you it is

14   going a lot faster than any of the other cars, okay?  You can

15   definitely see it passing every other vehicle.  It does that

16   for a while and then when it gets to Grand Avenue, it does go

17   for just a couple of seconds the wrong way.  It kind of crosses

18   across Grand Avenue going the wrong way to pull into some sort

19   of -- I don't know.  It's like a dirt parking lot, Your Honor,

20   where they kind of hang out for a little bit and then

21   eventually it gets back on the road and takes off to Paris

22   Frazier's girlfriend's house which is on Anderson Road in

23   Phoenix and I believe that is somewhere near 7th Street and

24   Bell, that general area.

25             THE COURT:  Does law enforcement stop the chase?

United States District Court

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1    MS. JENNIS:  No, it does not because -- and this is

2    in the complaint -- for safety of law enforcement and of the

3    public.  They stop the chase early on.  So that's before they

4    go the wrong way up Grand Avenue.

5    THE COURT:  So the answer to my question was, they

6    stopped the chase?

7    MS. JENNIS:  They stopped the chase, yes.  But they

8    did have air surveillance.

9    Then --

10    THE COURT:  And so this is by air surveillance tape

11    that you're relaying this?

12    MS. JENNIS:  Yes.  I mean, I have -- the agent

13    reviewed it.  I've also reviewed it and I did just provide it

14    to Mr. Tate.

15    THE COURT:  Okay.

16    MS. JENNIS:  When they get to Mr. Frazier's

17    girlfriend's house, they park across the street.  Mr. Frazier

18    gets out of the vehicle and then he moves a truck from the

19    driveway of his girlfriend's house and then the Camry pulls in

20    where the truck was.  So then you really can't see anything

21    after that, Your Honor.  There's nothing -- you can't see

22    what's going on.  Law enforcement does approach the house later

23    on that evening.  They call everyone inside the house out and

24    this is in the complaint.  Four people exit the house, the

25    three defendants and the girlfriend.  There is nothing.

United States District Court

```
 1              The Camry owned by Mr. Foster is searched.  There's
 2    nothing found in the Camry.  The cocaine is -- was thrown out
 3    of the car.  It was in a duffel bag, thrown out of the car
 4    early on in the chase and it is located.  Mr. Frazier provides
 5    some details about that.  Located in the house, as we discussed
 6    earlier, were many, many weapons, many firearms, long arms and
 7    pistols, most of which belonged to Mr. Frazier.  Mr. Frazier
 8    did identify two firearms as belonging to Mr. Foster and two
 9    belonging to Mr. Deatherage, one being a pistol and one being
10    an assault rifle.
11              THE COURT:  Mr. Foster's weapons that were found in
12    the home?
13              MS. JENNIS:  A pistol and an assault rifle and also
14    the same with Mr. Deatherage.
15              THE COURT:  And this is from the co-defendant or is
16    this from licensure on the weapons?
17              MS. JENNIS:  This is from the co-defendant's
18    statement.  Those firearms -- I don't believe we've done a
19    trace on them or completed that yet.  But they don't come back
20    to -- they are not weapons that are required to be registered,
21    Your Honor.
22              THE COURT:  Okay.
23              MS. JENNIS:  But we will conduct a trace and possibly
24    find out who purchased those firearms and when, but we don't
25    have that information.
```

United States District Court

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1        THE COURT:  Okay.  But the reason you're saying it is

2   because it was communicated by the co-defendant?

3        MS. JENNIS:  Yes.  Mr. Frazier is why we know this.

4   Mr. Frazier also told us that those firearms that were owned by

5   Deatherage and by Foster were inside the vehicle during the

6   time I've described, from the parking lot to where the drugs

7   were to the journey to the girlfriend's house.  But they were

8   not there when law enforcement got there and searched the

9   vehicle.

10       Now, we don't know much about Mr. Foster.  Does that

11  answer your question about the offense?  I think you had

12  additional questions, a little bit about the Facebook and a

13  about his affiliation with groups?

14       THE COURT:  My last question, the question that you

15  just answered, was what was the alleged role of Mr. Foster in

16  the incident stated in the indictment and then was -- what was

17  observed by law enforcement, if any of it, and then you

18  answered that.  The next question I had was, is the Government

19  aware of any known ties that Mr. Foster may have to the Arizona

20  Special Operations militia group that was referenced during the

21  other co-defendant's hearings or any other militia group?

22       And then the last piece of information I had was that

23  I had reviewed the exhibits from Mr. Deatherage's detention

24  hearing which reflected Mr. Foster's name on the social network

25  and it looked like Facebook is what those exhibits were.

United States District Court

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1          MS. JENNIS:  You are correct.

2          THE COURT:  And Mr. Foster's name was posted as a

3    like to two different statements that were reflected in the

4    exhibits from Mr. Deatherage's detention hearing.

5          But my first question before that was any known ties

6    to the Arizona Special Operations group that was referenced

7    during the co-defendant's hearings?

8          MS. JENNIS:  All the United States knows is that you

9    are correct, that he does like two statements on the Special

10   Operations or Arizona Special Operations group's Facebook.  The

11   agent and I did go back and look.  I didn't see any comments.

12   Sometimes you can't see those on printouts.  I did not see any

13   comments made by Mr. Foster.  I just saw where he had liked.

14          I don't know --

15          THE COURT:  Was this the Facebook page for Arizona

16   Special Operations or was this the Facebook page for Mr. --

17          MS. JENNIS:  Yes.

18          THE COURT:  It was co-defendant Deatherage went by a

19   name of Winchester on those pages that were attached to the

20   exhibit sheets and it indicated Facebook, so it was Facebook

21   for the Arizona Special Operations?

22          MS. JENNIS:  Yes.  So this would have been Exhibit 1

23   that the United States presented at Robert Deatherage's

24   detention hearing.  It is the Facebook -- it is public Facebook

25   so it was just printed out for Arizona Special Operations

United States District Court

11

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1    group.

2              THE COURT:  Okay.

3              MS. JENNIS:  It is believed that Mr. Deatherage, who

4    goes by the name Anthony Winchester, is the leader of that

5    group and the agent and I, after you had your hearing last

6    Friday, went on the Facebook page to see if there were any

7    comments made and we did not see any comments because sometimes

8    you can't see those when you print them out.  There's

9    additional ways to look but we didn't see it.

10             So I don't know about his affiliation with militia

11   groups.  All the United States knows is that on May 29 -- I

12   previously represented it was May 23 but on May 29 Mr. Foster,

13   Mr. Deatherage and Mr. Frazier were all present at an Islamic

14   protest in Phoenix, Arizona.

15             At that protest, there were photographs taken by law

16   enforcement.  And I found out yesterday that these fast -- and

17   I communicated that to Mr. Tate last night and that his -- I

18   think I always represented that Mr. Foster was at that

19   gathering but he was actually armed with an assault rifle which

20   appears to be the same automatic rifle that was located at

21   Mr. Frazier's girlfriend's house on July 22, 2015.

22             At all times, as is the same with the other people,

23   you know, they are allowed to have the assault rifles and they

24   are pointing down.  They are not pointed at people.  It's a

25   standard kind of photograph, but he is there with some tactical

United States District Court

CR-15-00924-PHX-GMS(DKD), August 4, 2015

```
 1   gear on and an assault rifle and that is --
 2           THE COURT:  With a what -- oh, tactical gear on.
 3           MS. JENNIS:  Tactical gear and an assault rifle on,
 4   Your Honor.  That is just additional information that I have.
 5           I got relayed to me that somehow you had a question
 6   about aliases.  I don't have any known aliases for Mr. Foster.
 7           THE COURT:  I don't --
 8           MS. JENNIS:  I don't know.  Mr. Kirby, when he
 9   covered, had mentioned that but maybe he was -- you know, since
10   he was just covering me, was perhaps he was talking because
11   Mr. Deatherage using the alias as Mr. Winchester.
12           THE COURT:  I did not have listed in my questions
13   that I had that an alias question with regard to Mr. Foster.
14           I may have mentioned the picture of Mr. Deatherage
15   that had the word "sniper" on it but I don't know if I did or
16   not.  It might have been in Mr. Deatherage's hearing.
17           MS. JENNIS:  Well, Your Honor, all I have is that he
18   doesn't have any known aliases that we know about.
19           THE COURT:  Okay.
20           MS. JENNIS:  I don't recall if there were additional
21   questions, Your Honor.
22           THE COURT:  I did not have any additional questions
23   at the Friday hearing.  I am going to ask you one question from
24   information you just told me, though.  You said there was an
25   Islamic protest.  Who was protesting what?
```

United States District Court

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1    MS. JENNIS:  I'm just looking at my noting notes,

2  Your Honor, if you bear with me.

3    THE COURT:  What do you mean by an Islamic protest?

4    MS. JENNIS:  If I may?

5    THE COURT:  Yes.

6    MS. JENNIS:  I was consulting with the case agent,

7  Adam Nixon, special agent with the FBI.  If Your Honor recalls,

8  recently there was a shooting in Texas at a mosque involving

9  the cartoons and the people who attended this protest what mad

10  at Islam and they were mad at them for going, the people who

11  went to them in Texas and were shooting at the people in Texas.

12    THE COURT:  So at an Islamic mosque here in Phoenix

13  there was a protest by people against --

14    MS. JENNIS:  Against Islam, Your Honor.

15    THE COURT:  Against Islam.  Okay.  It was at a mosque

16  here in Phoenix did you say.

17    MS. JENNIS:  Yes.  I was going to give Your Honor the

18  address.  That's what I was looking up.  It's the Islamic

19  Community Center in Phoenix at 7516 North Black Canyon Highway,

20  Phoenix, Arizona 85051.  It is not the first protest this year.

21  I believe it's the second one that occurred on May 29 of 2015.

22    THE COURT:  Okay.

23    Was there anything further from the Government at

24  this point in time?

25    MS. JENNIS:  No, Your Honor.

14

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1            THE COURT:  Okay.  And then, Mr. Tate, I know this is
2   a presumption case.  Go right ahead.
3            MR. TATE:  Judge, would you prefer I speak at the
4   podium?
5            THE COURT:  Whichever is easier for you.  If you have
6   all of your notes there, you can certainly stay at the seat or
7   if you need to consult with your client, you can stay there.
8   Whatever is more convenient to you just as long as I can hear
9   you.
10           MR. TATE:  Yes, ma'am.
11           Judge, I think I would prefer if I can work
12   backwards.
13           THE COURT:  Certainly.
14           MR. TATE:  Meaning the Islamic protest and, again,
15   the problem here, Judge, is that there's a whole lot of back
16   story that we don't know.  One, I am familiar with the incident
17   that happened in Texas and then the gentleman that then had a
18   cartoon -- Islamic cartoon here and the protest happened at
19   this Islamic mosque.  And here I don't want to relate as in any
20   factual basis because I'm just going from what I watched on the
21   news, but I am familiar with the situation in Texas and then
22   following the story here that they had a cartoon Mohammed, a
23   cartoon of Mohammed type of contest here and that protest
24   happening at this particular mosque.
25           The problem with -- and we would ask that the Court

United States District Court

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1    not give a lot of weight to that situation because, one, we

2    don't know, and the Government has not provided any

3    information, that Mr. Foster had any connection to the

4    gentleman that organized this protest or that he was doing

5    anything other than exercising his constitutional right to

6    peacefully protest at this particular mosque.

7              There's just too many unknowns about it.  Judge, the

8    Government has not produced any type of evidence that

9    Mr. Foster has any type of role in or special connection to the

10   Arizona Special Operations group.  If we proceed backwards and

11   talk about Mr. Frazier and him claiming that certain weapons

12   were Mr. Deatherage or certain weapons were Mr. Foster, Judge,

13   I have been able to cover a lot of the Facebook posts and posts

14   from Mr. Frazier and I would just offer to the Court that

15   almost anything Mr. Frazier says is with suspect because of his

16   posts and mainly just to say of his disgusting nature of his

17   posts.

18             Judge, there has been no connection with my client at

19   this point, at this early point, with him providing any

20   weapons.  Of course I'm not going to comment on his -- on any

21   type of specific role in him either allegedly driving a car or

22   not and I am -- that part I am just going to leave to the

23   Court's discretion.

24             Judge, I would ask the Court to consider, though,

25   that Mr. Foster, as was claimed originally in the affidavit,

United States District Court

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1    the Government now has agreed that Mr. Foster was not involved

2    in specifically going and getting drugs or the five or six

3    kilos in making contact, getting these drugs at this particular

4    warehouse.

5            I would ask the Court to consider also that while I

6    cannot avow as to how all of this began, I think it is

7    undisputed that the Government made contact with Mr. Frazier

8    and their contact with Mr. Frazier led to a long trail of

9    contact and following up on Mr. Frazier and all of that.

10           There was not any initial contact or surveillance of

11   Mr. Foster.  There was no initial contact so far as wait a

12   minute, we need to check out who this Foster guy is from the

13   beginning.  Mr. Frazier had made all of these statements and

14   viewed his posts.  And, again, I'll let the Government contact

15   as to how the initial, but there was a whole lot of background

16   that happened with Mr. Frazier, not with my client as in coming

17   up on any radar anything.

18           Now, let's talk about those particular names and I am

19   learning much more about Facebook posts than I had ever known

20   before.  My understanding is that a meme is when you take a

21   picture -- a picture is taken of someone, usually let's say a

22   celebrity because in this particular Facebook post there was

23   also a picture of President Reagan holding a -- it looks like a

24   wine glass.  Looks like he's at a state dinner.  And then they

25   put over it or under it some quote like, and I beg the Court's

CR-15-00924-PHX-GMS(DKD),  August 4, 2015

1    indulgence just -- something like, you know, let's kill all of

2    the mother fuckers.

3              Now, we know that President Reagan never had any

4    affiliation or comment or anything like this.  But they take

5    the picture, put the comment under it as if it's attributed to

6    President Reagan.  Here, Judge, the analogy is when it says,

7    "We're all fucking nuts but we're family and that means I'd

8    hide a body for you," I would caution the Court that the

9    picture of the people that are in the meme are not folks from

10   the Arizona Special Operations.

11             Now, I'm not vouching for that group.  I'm saying

12   that that's a meme that they take a picture from, put this

13   saying on, and Mr. Foster can like it, think it's funny.

14   There's been a number of memes made about Bill Cosby that

15   people show part of his Jello commercial, put a picture of

16   Sleeping Beauty there and people like it in the sense that they

17   may find it funny or not.

18             But what I do want to differentiate is to say it is a

19   meme.  It is not a quote from him or a specific person that he

20   is now endorsing.  Secondly, I believe, and I am willing to

21   defer to the Government, that the second quote, "How far are

22   you willing to go to protect yourself and your family's

23   liberties and personal freedom, we are not gonna lose our

24   country without a serious fight."

25             I am not sure whether that is a quote from

United States District Court

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1   Mr. Deatherage or Mr. Frazier but, again, we don't know -- it

2   shows Mr. Foster posted a like to the comment.  It does not

3   show that he made any comment with or posted any comments of

4   this nature.

5         Judge, it is a presumption case but we would ask,

6   Judge, that the presumption can be overcome in the sense that

7   there is under the statute a least onerous means of making sure

8   that Mr. Foster appears in Court.  He has a place of residence.

9         Now, that place of residence may change because it is

10  under -- subject to foreclosure and we're not sure if that's

11  going to happen or not.  Of course he would have to report that

12  to Pretrial Services and give any other residence that he would

13  stay at.

14        But, Judge, he has some serious health needs.  He has

15  been on disability.  Since he has been at CCA, he tells me that

16  he has not received any medication for PTSD or anxiety.  My

17  understanding was that the VA doctor had recommended and that

18  there was actually a service dog that helps him or aids him.

19  And for me to try to tell the Court how that works, I'm not

20  really sure.  Somehow it aids him and calms him and he was

21  actually provided this service dog.

22        Judge --

23        THE COURT:  For the PTSD or anxiety?

24        MR. TATE:  Yes, ma'am.  And so what we are asking is

25  that if he is on release, he can be strictly monitored.  He can

United States District Court

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1    be ordered not to have use of a computer at all, much less have

2    any contact with any Arizona Special Operations sites.  He has

3    no reason to be in contact with any member of the Arizona

4    Special Operations group.  He has no criminal record is my

5    understanding and, Judge, there is a least onerous means to

6    make sure that he is monitored, receives his medication and

7    also is not a danger to the community.

8              THE COURT:  Do you know what medication is he on?

9              MR. TATE:  My understanding is that he had not been

10   prescribed medication because they wanted to drop -- they, the

11   VA Hospital wanted to try the service dog first because at the

12   time he was a -- had a CDL license and was driving for Swift

13   Trucking and he could not be on those medications and drive.

14             THE COURT:  Okay.  So there's no medication currently

15   that is prescribed that he is not receiving at the facility

16   that he is in now?

17             MR. TATE:  Yes, Your Honor.  There is no prescribed

18   medication.  They were trying the dog and things of that nature

19   first and of course at CCA he can't have the service dog or

20   anything of that nature.

21             THE COURT:  Right.  Okay.  Thank you, Mr. Tate.

22             MR. TATE:  Yes, ma'am.

23             THE COURT:  And did the Government have anything in

24   rebuttal on the defense's proffer?

25             MS. JENNIS:  Your Honor, what Mr. Tate says is

United States District Court

CR-15-00924-PHX-GMS(DKD), August 4, 2015

```
1    correct.  You know, I don't believe that Mr. Foster posted
2    anything on this Facebook account but just something that I
3    didn't point out before.  In all fairness, I guess I thought
4    this was Mr. Frazier but the picture where Mr. Foster likes the
5    other one where it says on Exhibit 1 that I used in
6    Mr. Deatherage's case, it says, "Chance of a murder or
7    terrorist attacking this gathering," it's page five of that
8    exhibit.  Do you have that, Your Honor?
9              THE COURT:  I've got the exhibits with me.  Hang on.
10             Yes.  I have that page.
11             MS. JENNIS:  That is a picture of Mr. Foster.  I
12   think initially I thought that was Mr. Frazier.  Now, seeing
13   the pictures that were provided to me today by --
14             THE COURT:  Are you talking about the gentleman to
15   the left?
16             MS. JENNIS:  Yes, with the black hat on and the
17   firearm.
18             THE COURT:  Yes.
19             MS. JENNIS:  That is Mr. Foster.
20             THE COURT:  With Mr. Deatherage?
21             MS. JENNIS:  Yes.  And I have no information that
22   they knew each other before or that Mr. Foster was involved in
23   this group before or anything.
24             So when Mr. Tate says that we were looking at
25   Mr. Frazier and Mr. Foster came on our radar on July 22, he is
```

United States District Court

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1   correct.  Were we taking pictures of Mr. Foster?  Were we
2   looking for him when we were at the protest?  No.  It's just
3   something that law enforcement attends these protests to make
4   sure that they are peaceful and takes photographs.  They were
5   not targeting Mr. Foster.
6           THE COURT:  And this is a picture, what is it, the
7   meme -- what do they call it?
8           MR. TATE:  It's calls a meme.
9           THE COURT:  The meme that has the picture that says,
10  "Chance of a murderer or terrorist attacking this gathering,
11  that is a picture that was taken at the Islamic protest?"  Is
12  that what you are saying?
13          MS. JENNIS:  Yes.  On May 29 of 2015, Your Honor.
14          MR. TATE:  Judge, I'm not saying that that is a meme.
15  I am saying --
16          THE COURT:  The meme is something that comes from
17  another source.
18          MR. TATE:  Right.
19          THE COURT:  Yeah.  Got it.  Thank you.
20          MS. JENNIS:  This is different than the picture of
21  Ronald Reagan with a glass of wine.
22          THE COURT:  Right.  And a picture of the charters
23  from whatever --
24          MS. JENNIS:  Exactly.
25          THE COURT:  -- movie that was.

United States District Court

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1          MS. JENNIS:  And we have no indications that

2    Mr. Foster posted that.

3          THE COURT:  What did you say?

4          MS. JENNIS:  We have no indication that Mr. Foster

5    posted this post, just that he liked it.  Again, I saw no

6    evidence of any commentary by Mr. Foster other than that

7    clarification because I don't -- you know, I don't know I

8    really understood that that was him.  The last time we were

9    here but now just looking at photographs, it just comes to

10   light that that really is him in that picture.  It's

11   Mr. Foster.

12         So that was taken on May 29, 2015, at the protest at

13   the Islamic mosque.

14         But other than that, Your Honor, you know, I listened

15   to what Mr. Tate has to say and the United States has not

16   changed its position and a lot of it has to do with

17   Mr. Foster's mental health and I had talked to probation

18   about -- I mean Pretrial Services about this early on because I

19   wanted to know what they thought about getting him the proper

20   treatment for his post-traumatic stress.  And when I spoke to

21   Cici Foster -- no, relation to Erik Foster -- she told me that

22   she has seen improvement in other people who are on pretrial

23   release go through programs if not with the VA, then they have

24   other programs that really help them with their posttraumatic

25   stress disorder.  I don't know about the service dogs but I

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1    certainly have heard about service dogs assisting people with

2    mental health conditions.

3           So the United States today just wants Your Honor to

4    have the complete picture, but we still do believe that the

5    conditions set by Pretrial Services are such that would ensure

6    that Mr. Foster was neither a danger to himself or to the

7    community.

8           THE COURT:  All right.

9           Well, thank you, everyone, for coming back to answer

10   the questions that I had in addition to the information that

11   you've provided me with.

12          Mr. Foster, this is now taken under advisement by me

13   and I'll be issuing a ruling very shortly, hopefully by the end

14   of the day, and it will be posted probably or dropped as an

15   order probably tomorrow.  Okay.  Thank you very much.

16          MS. JENNIS:  Thank you, Your Honor.

17          MR. TATE:  Thank you, Your Honor.

18          (Proceedings concluded at 2:11 p.m.)

19

20

21

22

23

24

25

United States District Court

24

CR-15-00924-PHX-GMS(DKD), August 4, 2015

1

2

3

4                         C E R T I F I C A T E

5

6          I, ELAINE M. CROPPER, court-approved transcriber,

7     certify that the foregoing is a correct transcript, to the

8     best of my skill and ability, from the official electronic

9     sound recording of the proceedings in the above-entitled

10    matter.

11

12         DATED at Phoenix, Arizona, this 23rd day of January,

13    2017.

14

15

16

17                                   s/Elaine M. Cropper

18                                   _____

19                                   Elaine M. Cropper

20

21

22

23

24

25

                    United States District Court